**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

RONDABAY LIGGINS-McCOY,

        Plaintiff,

    v.

DEMOCRATIC CAUCUS OF THE SENATE
OF PENNSYLVANIA

    and

ANTHONY H. WILLIAMS (in his individual
capacity),

        Defendants.

Civil Action No:  2:19-cv-01639-PBT

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ANTHONY H.
WILLIAMS' MOTION FOR SUMMARY JUDGMENT**

---

ELIZABETH A. MALLOY
STEVEN D. MILLMAN
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA  19103
(215) 446-0031

*Attorneys for Defendant
Anthony H. Williams*

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................. 2

III.    ARGUMENT ......................................................................................................... 2

        A.      Standard of Review ................................................................................... 2

        B.      Sen. Williams Is Entitled to Summary Judgment on Plaintiff's FMLA Claim. ..... 3

                1.      Plaintiff Is Exempt from Coverage under the FMLA. ............................... 3

                2.      Plaintiff Cannot Establish a Prima Facie Case of FMLA Retaliation. ..... 12

                3.      Plaintiff Has No Evidence that Her Termination was a Pretext for FMLA
                        Retaliation. ............................................................................................. 16

        C.      Sen. Williams Is Entitled to Summary Judgment on Plaintiff's Aiding and
                Abetting Age Discrimination Claim. ....................................................... 20

                1.      As a Matter of Law, Plaintiff's Aiding and Abetting Claim against Sen.
                        Williams Must Be Dismissed Because There Is No Corresponding
                        Primary Violation By an Employer to Aid and Abet. .............................. 20

                2.      Plaintiff's Aiding and Abetting Claim Must Be Dismissed because
                        Plaintiff Cannot Establish an Unlawful Discriminatory Practice under the
                        PHRA. ..................................................................................................... 23

                        a.      Plaintiff cannot show a prima facie case of age discrimination.... 23
                        b.      Plaintiff has no evidence that her inclusion in the reorganization
                                was a pretext for age discrimination. ........................................... 27

IV.     CONCLUSION ................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul-Latif v. Cnty. of Lancaster*,
990 F. Supp. 2d 517 (E.D. Pa. 2014) ....................................................................15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................................2

*Arnold v. Autozone*,
2016 WL 807805 (E.D. Pa. 2016) .......................................................................23

*Arnold v. AutoZone, Inc.*,
No. 13-1329, 2016 U.S. Dist. LEXIS 25759 (E.D. Pa. Mar. 2, 2016)....................15

*Atchison v. Sears*,
666 F. Supp. 2d 477 (E.D. Pa. 2009) .............................................................12, 13

*Birch v. Cuyahoga Cty. Prob. Court*,
392 F.3d 151 (6th Cir. 2004) ....................................................................10, 11, 12

*Burch v. WDAS AM/FM Inc.*,
2002 WL 1471703 (E.D. Pa. June 28, 2002) ........................................................14

*Burgess-Walls v. Brown*,
2011 WL 3702458 (E.D. Pa. Aug. 22, 2011) ........................................................22

*Calero v. Cardone Indus.*,
2012 U.S. Dist. LEXIS 91173 (E.D. Pa. June 29, 2012) .......................................16

*Capps v. Mondelez Global LLC*,
147 F. Supp. 3d 327 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017)..............14

*Clews v. County of Schuylkill*,
461 F. Supp. 3d 142 (M.D. Pa. 2020) ....................................................................9

*Conley v. City of Erie*,
521 F. Supp. 2d 448 (W.D. Pa. 2007)........................................................... *passim*

*Cory v. White*,
457 U.S. 85 (1982)..............................................................................................22

*Dawkins v. Aramark*,
2010 WL 668543 (W.D. Pa. Feb. 24, 2010) .........................................................30

LEGAL\51142918\3

*Dici v. Cmwlth. Of Pa.*,
    91 F.3d 542 (3d Cir. 1996) ................................................................21

*Dickinson v. Millersville Univ. of Pa.*,
    2014 WL 1327610 (E.D. Pa. Apr. 3, 2014) .........................................21

*Ekhato v. Rite Aid Corp.*,
    529 F. App'x 152 (3d Cir. 2013) .........................................................20

*Farrell v. Planters Lifesavers Co.*,
    206 F.3d 271 (3d Cir. 2000) ................................................................13

*Fuentes v. Perskie*,
    32 F.3d 759 (3d Cir. 1994) .............................................................17, 27

*Giordano v. Unified Judicial Sys. of Pa.*,
    2021 WL 1193112 (E.D. Pa. Mar. 30. 2021) .....................................4, 8

*Gunaca v. State of Texas*,
    65 F.3d 467 (5th Cir. 1995) ...............................................................8, 9

*Gupta v. First Judicial Dist.*,
    759 F. Supp. 2d 564 (E.D. Pa. 2010) .................................................4, 8

*Haybarger v. Lawrence Co. Adult Probation and Parole*,
    667 F.3d 408 (3d Cir. 2012) ..................................................................3

*Hemminghaus v. Missouri*,
    756 F.3d 1100 (8th Cir. 2014) ...........................................................4, 7

*Hicks v. Tech Indus.*,
    512 F. Supp. 2d 338 (W.D. Pa. 2007) ..............................................5, 27

*Hoy v. Borough of Cochranton*,
    2016 WL 7406807 (Pa. Super. Jan. 6, 2017) .......................................17

*James v. Sutliff Saturn, Inc.*,
    468 F. App'x 118 (3d Cir. 2012) .........................................................20

*Jensen v. Potter*,
    435 F.3d 444 (3d Cir. 2006) ................................................................13

*Kaniuka v. Good Shepherd Home*,
    2006 WL 2380387 (E.D. Pa. Aug. 15, 2006) .....................................21

*Kautz v. Met-Pro Corp.*,
    412 F.3d 463 (3d Cir. 2005) ................................................................17

*Klinman v. JDS Uniphase Corp.*,
　439 F. Supp. 2d 401 (E.D. Pa. 2006) ...........................................................23, 24

*Krouse v. Am. Sterilizer Co.*,
　126 F.3d 494 (3d Cir. 1997) ...........................................................................13

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*,
　691 F.3d 294 (3d Cir. 2012) .......................................................................13, 17

*Lombard v. Lassip, Inc.*,
　2017 WL 6367956 (E.D. Pa. Dec. 13, 2017) ...............................................21, 22

*McIlmail v. Pennsylvania*,
　381 F. Supp. 3d 393 (E.D. Pa. 2019) ...........................................................20, 21

*Melrose, Inc. v. Pittsburgh*,
　613 F.3d 380 (3d Cir. 2010) ............................................................................2

*Montgomery v. Brookshire*,
　34 F.3d 291 (5th Cir. 1994) ............................................................................8

*Nelson v. Com. of Pa. Dept. of Public Welfare*,
　244 F. Supp. 2d 382 (E.D. Pa. 2002) ...............................................................22

*Nichols v. Hurley*,
　921 F.2d 1101 (10th Cir. 1990) ...................................................................11, 12

*Read v. Stone and Webster Eng. Corp.*,
　6 F. Supp. 2d 398 (E.D. Pa. 1998) ...................................................................23

*Ridgewood Bd. of Educ. V. N.E. ex rel. M.E.*,
　172 F.3d 238 (3d Cir. 1999) ..........................................................................2, 3

*Robinson v. Nat'l Med. Care, Inc.*,
　897 F. Supp. 184 (E.D. Pa. 1995) ....................................................................19

*Scott v. Airtran Airways, Inc.*,
　2006 WL 2711654 (W.D. Pa. Sept. 21, 2006) .....................................................23

*Scott v. Sunoco Logistics Partners, LP*,
　918 F. Supp. 2d 344 (E.D. Pa. 2013) ................................................................21

*St. Mary's Honor Ctr. v. Hicks*,
　509 U.S. 502 (1993) ..................................................................................17, 18

*Taplin v. Johnson*,
　90 Fed. Appx. 736 (5th Cir. 2004) .....................................................................8

iv

*Taylor v. West Penn Allegheny Gen. Hosp.*,
    2005 WL 3113187 (W.D. Pa. Nov. 21, 2005) ...................................................................24

*Teneyuca v. Bexar County*,
    767 F.2d 148 (5th Cir. 1985) ........................................................................... *passim*

*Thomas v. Town of Hammonton*,
    351 F.3d 108 (3d Cir. 2003)...........................................................................15

*Tomasso v. Boeing Co.*,
    445 F.3d 702 (3d Cir. 2006).........................................................................18

*Williams v. Phila. Hous. Auth. Police Dep't*,
    380 F.3d 751 (3d Cir. 2004).........................................................................14

*Wilson v. Graybar Elec. Co.*,
    2019 U.S. Dist. LEXIS 42339 (E.D. Pa. Mar. 15, 2019)...................................12, 13

*Ziegler v. Delaware Co. Daily Times*,
    128 F. Supp. 2d 790 ................................................................................27

**Statutes**

71 Pa. C. S. § 2103...............................................................................................4

29 U.S.C. § 203(e) ...............................................................................................3

29 U.S.C. § 203(e)(2)(C) .......................................................................................4

29 U.S.C. § 2611(3) ..............................................................................................3

29 U.S.C. § 2617(a) ..............................................................................................3

Pa. Stat. § 955(a)..............................................................................................22, 30

**Other Authorities**

29 C.F.R. § 825.104 .............................................................................................3

Fed. R. Civ. P. 56(a) ...........................................................................................2

Fed. R. Civ. P. 56(c)(1)(A) ...................................................................................2

Pa. Const. art. II, §§ 2, 3 ......................................................................................4

United States Constitution Eleventh Amendment ...................................................22

I.      **INTRODUCTION**

Plaintiff Rondabay Liggins-McCoy is a former staffer for Defendant Democratic State Senator Anthony H. Williams ("Sen. Williams" or "Defendant").  Although Plaintiff was hired directly by Sen. Williams as his staffer, Plaintiff, like all legislative staff members, was an employee of the Defendant Democratic Caucus of the Senate of Pennsylvania ("Caucus").

In 2017-2018, Sen. Williams grew concerned regarding issues he perceived with certain functions of his office and with particular members of his staff.  Sen. Williams wanted a staff that was much more aggressive in terms of outreach and much more connected with the community, so that he was more present in the minds of his constituents.  In an attempt to correct the issues within his office, and to navigate through the impending loss of his Chief of Staff (who had just provided her formal one year notice of retirement), Sen. Williams developed a reorganization and transition plan.  After much consideration, the reorganization and transition plan focused on eliminating and consolidating roles to increase the efficiency of the office, discharging staff as necessary, hiring new staff, moving staff among his offices, transitioning or promoting current staff to new roles, and distributing the duties of separated staffers among new and existing staff.  Plaintiff was among those employees separated from employment as a part of the reorganization, based both of the fact that her position was eliminated and because she failed to meet his expectations.  In particular, on December 5, 2018, Plaintiff and her 38 year old colleague, Don Cave, were informed that they would be discharged in connection with the reorganization.

In this lawsuit, Plaintiff asserts the following causes of action with respect to Sen. Williams: retaliation in violation of the Family and Medical Leave Act ("FMLA") (Count Two), and aiding and abetting age discrimination in violation of the Pennsylvania Human Relations Act ("PHRA"). Sen. Williams is entitled to summary judgment on these claims for a number of reasons.  First, this Court should grant Sen. Williams' Motion for Summary Judgment on Count Two because Plaintiff

is exempt from coverage under the FMLA, or, in the alternative, because Plaintiff has not

established a *prima facie* case of FMLA retaliation, or because Plaintiff has no evidence that her

inclusion in the reorganization was a pretext for FMLA retaliation.  Second, this Court should grant

Defendant's Motion for Summary Judgment on Amended Count Three because there is no

corresponding primary violation of the PHRA by the Caucus for Sen. Williams to aid and abet, or,

in the alternative, because Plaintiff has not established a *prima facie* case of age discrimination, or

because Plaintiff has no evidence that her inclusion in the reorganization was a pretext for age

discrimination.

## II.    FACTUAL BACKGROUND

Defendants jointly filed a Statement of Undisputed Material Facts ("SUMF"), and

accompanying exhibits A through W, which Sen. Williams incorporates by reference.  (*See* dkt.

entry no. 45, Defendants' SUMF.)

## III.   ARGUMENT

### A.    Standard of Review.

Summary judgment is appropriate when there is no genuine issue of fact and the moving

party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Melrose, Inc. v. Pittsburgh*,

613 F.3d 380, 387 (3d Cir. 2010).  Issues of fact are genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  Material facts are those that will affect the outcome of the trial under

governing law.  *Anderson*, 477 U.S. at 248.

After the moving party has met its initial burden, the adverse party's response must, "by

citing to particular parts of materials in the record," set out specific facts showing a genuine issue

for trial.  FED. R. CIV. P. 56(c)(1)(A).  "Speculation and conclusory allegations do not satisfy this

duty."  *Ridgewood Bd. of Educ. V. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).  Summary

2

judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Id.*

**B.     Sen. Williams Is Entitled to Summary Judgment on Plaintiff's FMLA Claim.[2]**

**1.     Plaintiff Is Exempt from Coverage under the FMLA.**

Plaintiff's FMLA claim cannot survive summary judgment because, as a matter of law, Plaintiff is not a covered "employee" under the FMLA.  Specifically, Plaintiff is exempt from coverage under the FMLA because she falls within the FMLA's "personal staff" exemption.

The right to bring a civil action under the FMLA is limited to those individuals defined as "employees" under the Act.  29 U.S.C. § 2617(a).  The FMLA defines the term "employee" for FMLA purposes as having the same meaning given that term in section 203 of the Fair Labor Standards Act ("FLSA").  *See* 29 U.S.C. § 2611(3) ("The terms 'employ', 'employee', and 'State' have the same meanings given such terms in subsections (c), (e), and (g) of section 203 of this title.").  The explicitly referenced 29 U.S.C. § 203(e) contains the personal staff exception, which excludes from coverage those individuals "selected by the holder of such an office to be a member of his personal staff."  29 U.S.C. § 203(e)(2)(C).[3]  The implementing FMLA regulations, 29 CFR Part 825, incorporate these statutory definitions in section 825.102.

---

[2] There is no FMLA claim against Defendant Caucus.  There is a potential FMLA claim against an individual because the definition of "employer" under the FMLA includes "any person acting, directly or indirectly, in the interests of a covered employer."  29 C.F.R. § 825.104; *see also Haybarger v. Lawrence Co. Adult Probation and Parole*, 667 F.3d 408, 413-14 (3d Cir. 2012).  As noted in Section III(C)(1), *infra*, however, that is not the case under the PHRA.

[3] Section 203(e) of the FLSA – which is adopted by the FMLA – states in relevant part:

> (e)(1) Except as provided in paragraphs (2), (3), and (4), the term "employee" means any individual employed by an employer.
> (2) In the case of an individual employed by a public agency, such term means--
> . . . .
> > (C) any individual employed by a State, political subdivision of a State, or an interstate governmental agency, **other than such an individual**--
> > > (i) who is not subject to the civil service laws of the State, political subdivision, or agency which employs him; and
> > > (ii) who—
> > > > (I) holds a public elective office of that State, political subdivision, or agency,
> > > > (II) **is selected by the holder of such an office to be a member of his personal staff**.

The United States Court of Appeals for the Third Circuit has not established standards for determining whether an employee falls within the personal staff exemption. *See Giordano v. Unified Judicial Sys. of Pa.*, 2021 WL 1193112, *5 (E.D. Pa. Mar. 30. 2021).  Instead, district courts within the Third Circuit apply the six-factor analysis set forth in *Teneyuca v. Bexar County*, 767 F.2d 148 (5th Cir. 1985).  *See id.*[4]  These factors are:

> (1) whether the elected official has plenary powers of appointment and removal,
>
> (2) whether the person in the position at issue is personally accountable to only that elected official,
>
> (3) whether the person in the position at issue represents the elected official in the eyes of the public,
>
> (4) whether the elected official exercises a considerable amount of control over the position,
>
> (5) the level of the position within the organization's chain of command, and
>
> (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Teneyuca*, 767 F.2d at 151; *see also Giordano*, 2021 WL 1193112, at *5-6; *Gupta v. First Judicial Dist.*, 759 F. Supp. 2d 564, 568-69 (E.D. Pa. 2010) (applying Fifth Circuit's factors); *Conley v. City of Erie*, 521 F. Supp. 2d 448, 453-55 (W.D. Pa. 2007) (granting summary judgment for defendant after applying *Teneyuca* factors and determining that plaintiff – who was Public Safety Director for City of Eire – was exempt from definition of "employee" because he was member of Mayor's personal staff).  As analyzed below, here, there is no genuine issue of material fact as to the applicability of the relevant factors, and, thus, summary judgment is appropriate.

---

29 U.S.C. § 203(e)(2)(C).  As a threshold matter, a State Senator is an elected official, and Plaintiff (and other members of a State Senator's staff) are not subject to the civil service laws of the Commonwealth.  *See* Pa. Const. art. II, §§ 2, 3; 71 Pa. C. S. § 2103.  For these reasons and because Plaintiff is a member of Sen. Williams' personal staff, she does not fall within the definition of an "employee" under the FMLA.

[4] Due to the explicit reference to the FLSA in the FMLA's definition of "employee," courts apply the *Teneyuca* factors in the FMLA context.  *See, e.g.*, *Hemminghaus v. Missouri*, 756 F.3d 1100, 1108-09 (8th Cir. 2014).

4

### a. Whether Sen. Williams has plenary powers of appointment and removal over Plaintiff.

The first factor courts evaluate to determine whether an employee falls within the personal staff exemption is whether the elected official has plenary powers of appointment and removal. *Teneyuca*, 767 F.2d at 151.  In *Conley*, the Court found that, despite the fact that City Council approval was required for the appointment, such approval was a mere formality and did not change the fact that the Mayor personally selected the plaintiff for the job and had fired the plaintiff's predecessor.  *Conley*, 512 F. Supp. 2d at 453.

Here, it is undisputed that Sen. Williams is an elected official who had plenary powers of appointment and removal over Plaintiff.  (SUMF at ¶ 3, 5 ("The only person who is allowed to hire and fire as they please in that office is State Senator Anthony Williams.  He retains sole discretion."); ("Q. Is each Senator allowed the discretion to hire and fire as they choose for their offices?  A. Yes.").)  Moreover, Plaintiff's Amended Count Three acknowledges this.  (SUMF at ¶ 5; Dkt. entry no. 36, Pl.'s Am. Count Three at ¶ 36 ("Sen. Williams at all times relevant herein possessed the exclusive authority to approve of the hiring and firing of his office's staff members.").)  It follows that Sen. Williams hired Plaintiff himself.  (SUMF at ¶ 4.)  Accordingly, the first factor weighs in favor of Plaintiff fitting within the personal staff exemption.

### b. Whether Plaintiff was personally accountable only to Sen. Williams.

The second factor courts evaluate is whether the person is personally accountable to only that elected official.  *Teneyuca*, 767 F.2d at 151.  In *Conley*, the plaintiff alleged that he was not personally accountable only to the Mayor because he reported to the Mayor's assistant at times.  *Conley* 521 F. Supp. 2d at 454.  Evaluating the plaintiff's argument, the Court stated:

> Even were we to accept plaintiff's allegation that he sometimes reported to Ms. Mengine, the Mayor's assistant, this would not have a determinative effect on our analysis.  It is not remarkable that plaintiff had to, at times, go through the Mayor's assistant to get to the Mayor.  That is simply a function of a busy, high-level

5

> government office that must deal with a myriad of issues on a daily basis.  What is
> determinative is that plaintiff did not report to anyone outside of the Mayor's office.
> This fact cannot be disputed.

*Id.*  Here, Plaintiff was ultimately personally accountable to only Sen. Williams.  (SUMF at ¶¶ 7,

22.)  Moreover, even if Plaintiff claims that she was accountable to other individuals – such as Sen.

Williams' Chief of Staff – such an argument should not factor into this Court's analysis.  Like in

*Conley*, any such arrangement would merely be the reality of a busy, high-level government office.

As the *Conley* Court stated, what is determinative is that Plaintiff did not report to anyone outside of

Sen. Williams' office.  This fact cannot be disputed.  Accordingly, the second factor weighs in favor

of Plaintiff fitting within the personal staff exemption.

<strong>c.      Whether Plaintiff represented Sen. Williams in the eyes of the public.</strong>

The third factor courts evaluate is whether the person in the position at issue represents the

elected official in the eyes of the public.  *Teneyuca*, 767 F.2d at 151.  In holding that the plaintiff's

position in *Conley* represented the Mayor in the eyes of the public, the Court relied on, *inter alia*,

the fact that the plaintiff represented the City at public meetings and met with various citizens

groups on behalf of the Mayor.  *See Conley*, 521 F. Supp. 2d at 454.

Here, like in *Conley*, there is no dispute that Plaintiff represented Sen. Williams in the eyes

of the public.  As Sen. Williams' Director of Constituent Services, it was *her job* to represent Sen.

Williams publicly.  (SUMF at ¶¶ 14, 17-20.)  At her deposition, Plaintiff testified with specificity

with regard to how she represented Senator William in the eyes of the public:

> Things I did for Mr. Williams' [sic] at that time were to meet with community
> leaders.  I was a community liaison as well, went to meetings, I represented Mr.
> Williams at these meetings.  I vetted people that would call in to Delaware County
> that wanted to meet with Mr. Williams to, you know, see if it was a meeting that he
> needed to take or if it was something that I could handle for him in his – as his
> representative.  I also planned many, many events throughout the district in
> Delaware County, events that were community oriented events and, of course, a lot
> of constituent services work.

6

(SUMF at ¶ 17.)  Plaintiff further testified that she spent 50-60% of her time representing the
Senator through her attendance at events outside of the office on his behalf.  (SUMF at ¶ 18
(testifying that she attended community meetings and networked with public officials and
community leaders on behalf of Sen. Williams).)  Plaintiff was Sen. Williams' primary
representation in Delaware County – not only his eyes and ears, but also the person his Delaware
County constituents could turn to in order to get issues brought to his attention.  (SUMF at ¶ 19.)
Thus, the third factor weighs in favor of Plaintiff fitting within the personal staff exemption.

> **d.    Whether Sen. Williams exercised a considerable amount of control over Plaintiff's position.**

The fourth factor courts evaluate is whether the elected official exercises a considerable
amount of control over the position.  *Teneyuca*, 767 F.2d at 151.  In *Conley*, the Court stated that
"although plaintiff was given the freedom any professional would need to carry out his day-to-day
duties, ultimately, plaintiff's actions and policies were subject to the Mayor's approval and control."
*Conley*, 521 F. Supp. 2d at 454.  The *Conley* Court noted that the fact that the Mayor exercised
considerable control over the plaintiff was "best demonstrated by noting that when the Mayor was
not satisfied with the performance of plaintiff's predecessor, he fired him."  *Id.*  In *Hemminghaus*,
the Eighth Circuit analyzed the amount of control a judge had over the official court reporter
position.  *Hemminghaus*, 756 F.3d at 1108-09.  There, the Court noted that the judge "had complete
authority to hire and fire his official court reporter," determined the plaintiff's working hours, and
authorized his leave.  *Id.*

Here, it is undisputed that Sen. Williams exercised a considerable amount of control over
Plaintiff's position.  Sen. Williams was Plaintiff's ultimate supervisor, and he employed her to be
his "eyes and ears" in Delaware County (SUMF at ¶¶ 7, 19.)  Like in *Hemminghaus*, Sen. Williams
determined Plaintiff's working hours and authorized her paid time off and her leave.  (SUMF at
¶ 23.)  Most importantly, Sen. Williams had complete authority to hire and fire Plaintiff.  (SUMF at

7

¶ 5.)  As the *Conley* Court expressed, the fact that Sen. Williams exercised considerable control over Plaintiff's position is best demonstrated by the fact that when he was not satisfied with her performance, he terminated her employment.  Accordingly, the fourth factor weighs in favor of Plaintiff fitting within the personal staff exemption.

> **e.    The level of Plaintiff's position within the organization's chain of command.**

The fifth factor courts evaluate is the level of the position within the organization's chain of command.  *Teneyuca*, 767 F.2d at 151.  When considering this factor, courts look to whether the elected official is the staff member's ultimate supervisor and how attenuated the chain of command is between the elected official and the staff member.  *See, e.g.*, *Gupta*, 759 F. Supp. 2d at 571-72 (citing *Taplin v. Johnson*, 90 Fed. Appx. 736, 740 (5th Cir. 2004)).  For example, in *Giordano*, the Court found that the plaintiff's position as Staff Attorney II was too removed from the Superior Court judges to constitute "personal staff," as the plaintiff reported the Civil Supervisor, who reported to the Deputy Chief Staff Attorney, who reported to the Chief Staff Attorney, who reported to the Executive Administrator of the Superior Court, who (finally) reported to a judge.  *Giordano*, 2021 WL 1193112, at *6.  Conversely, courts regularly find that employees who may not be directly below the elected official in the chain of command still fall within the personal staff exemption.  *See, e.g.*, *Taplin*, 90 Fed. Appx. at 740 (holding that plaintiff being one step removed from elected official in command structure was consistent with conclusion that she was member of personal staff); *Gupta*, 759 F. Supp. 2d at 571-72 (stating that plaintiff, who was only one level removed from elected official in chain of command, was personal staff).[5]  Moreover, in command

---

[5] The Fifth Circuit has noted that "[i]n a small office, an employee's placement in the chain of command is less significant to a consideration of the nature and circumstances of the employment relationship between employee and employer."  *Gunaca v. State of Texas*, 65 F.3d 467, 472-73 (5th Cir. 1995) (finding that plaintiff was member of former district attorney's personal staff despite the fact that three levels of supervisors separated plaintiff from the district attorney).  In *Gunaca*, the Court held that the district attorney's relatively small office of fifty-five employees was so small that it balanced out the attenuated chain of command between plaintiff and the district attorney.  *See id.* (comparing size of district attorney's office to the larger 113 employee office in *Montgomery v. Brookshire*, 34 F.3d

structures where a plaintiff does not report directly to the elected official, courts find that "[w]hat is determinative is that plaintiff did not report to anyone outside of the [elected official]'s office." *See Conley*, 521 F. Supp. 2d at 454 (finding that plaintiff's allegation that he sometimes reported to Mayor's assistant did not have determinative effect on analysis, as "[w]hat is determinative is that plaintiff did not report to anyone outside of the Mayor's office"); *see also Clews v. County of Schuylkill*, 461 F. Supp. 3d 142, 153 (M.D. Pa. 2020) (dismissing plaintiffs' argument that because they considered coroner's chief deputy to be their supervisor they were not among coroner's personal staff, as, even viewing this fact in light most favorable to plaintiffs, chief deputy was a member of coroner's office, it makes practical sense for coroner to rely on help of chief deputy to oversee certain matters, and plaintiffs did not aver than they reported to anyone other than coroner and deputy coroner (and more specifically, to anyone outside of coroner's office).

Here, it is undisputed that Plaintiff's ultimate supervisor was Sen. Williams.  (SUMF at ¶ 7.) Sen. Williams hired Plaintiff, is listed as Plaintiff's supervisor on Plaintiff's employment documents, directed her work, approved her time off, and terminated her employment.  SUMF at ¶¶ 7, 17, 19-20, 22-23, 99.)  In fact, Plaintiff's entire role in Sen. Williams' office was solely to promote *his* agenda, including, but not limited to, directing the activities of Sen. Williams' Delaware County office on his behalf, writing to and meeting with community leaders and constituents on behalf of Sen. Williams and representing him in such meetings, vetting people that would call in to Sen. Williams' office to see if it was a meeting Sen. Williams should take, or if it was something she could handle for him as his representative, preparing written responses reflecting Sen. Williams' position or record on public policy issues, representing Sen. Williams at events, attending events with Sen. Williams, and interacting with local government officials and agencies

291, 297 (5th Cir. 1994)).  Here, Sen. Williams' office is far smaller than even the 55-employee office that the *Gunaca* Court found was small.  (SUMF at ¶ 130 (noting that Sen. Williams' office consists of only 12 staffers).)

on behalf of Sen. Williams.  (SUMF at ¶¶ 17, 54.)  As Sen. Williams' primary representation in

Delaware County, Plaintiff brought important and sensitive constituent issues directly to Sen.

Williams' attention.  (SUMF ¶ 19.)

Although Plaintiff may argue that Marlene Henkin, Sen. Williams' Chief of Staff,

supervised her at times, there is no dispute of fact that Sen. Williams was in fact Plaintiff's ultimate

supervisor.  (SUMF at ¶ 7.)  To be clear, within the district offices of State Senators, there may be a

chief of staff or office manager that helps oversee the daily activities of the office, but in every case,

the State Senator is ultimately the supervisor for individuals in Plaintiff's position.  (SUMF at ¶ 7.)

Simply put, Sen. Williams dictated the work Plaintiff performed, and Plaintiff was ultimately

accountable only to him.  (SUMF at ¶ 22.)  Accordingly, the fifth factor weighs in favor of Plaintiff

fitting within the personal staff exemption.

> **f.     The intimacy of the working relationship between the elected official and Plaintiff.**

The sixth and final factor courts evaluate is the intimacy of the working relationship

between the elected official and the person.  *Teneyuca*, 767 F.2d at 151.  In *Birch v. Cuyahoga Cty.*

*Prob. Court*, the United States Court of Appeals for the Sixth Circuit considered whether a

magistrate judge was among the personal staff of the presiding judge.  *Birch v. Cuyahoga Cty.*

*Prob. Court*, 392 F.3d 151, 159 (6th Cir. 2004).  The Court reasoned:

> As to the sixth factor, the evidence suggests that Birch has an intimate working
> relationship with Judge Donnelly because Birch is only one of ten magistrate judges
> at the Probate Court, and Judge Donnelly depends on Birch to complete the work of
> the court.  Birch contends that the relationship is not intimate because Judge
> Donnelly has provided very little by way of hands-on or day-to-day interaction with
> Birch.  Her contention, however, is supported only by her vague, conclusory denial
> of regular contact with Judge Donnelly.  *See* J.A. 325 ("My contact with
> management on a day-to-day basis occurs much more frequently with Magistrate
> Polito than with ... Judge Donnelly.").  The undisputed facts remain that Birch, like
> the other magistrate judges, represents Judge Donnelly in the eyes of the public,
> completes work that Judge Donnelly cannot himself complete, and makes
> substantive recommendations to Judge Donnelly on matters before the court.  Thus,
> Birch's relationship with Judge Donnelly is intimate in the sense that their respective

10

duties are heavily interdependent.  Their relationship does not lose its intimate status merely because Birch is afforded a necessary degree of autonomy in her work, such that she and Judge Donnelly need not interact on a daily basis.  Based on the totality of the factors, we hold that Birch is exempt from [ ] coverage as a member of Judge Donnelly's personal staff.

*Id.*  In *Nichols v. Hurley*, the Tenth Circuit aggregated cases to evaluate the sixth factor:

> The record is rather sparse concerning the final factor: the actual intimacy of plaintiffs' working relationship with Sheriff Gray.  Although plaintiffs averred they did not assist Sheriff Gray in making policy decisions or act as his advisers (factors not pertinent to the personal staff exception), nonetheless they were privy to sensitive information concerning the cases on which they worked.  In *McBee,* the court reasoned, as do we, that one can assume a certain level of intimacy from the nature of a deputy sheriff's role in a small county.  In *Owens,* this court concluded that a high level of personal accountability could be implied from the fact that the plaintiff served at the pleasure of the sheriff, who had plenary powers of appointment and removal, and who was liable for any default or misconduct by the plaintiff in the performance of his duties.  Other courts have held that a high level of personal accountability equates with a confidential relationship that falls within the personal staff exception.

*Nichols v. Hurley*, 921 F.2d 1101, 1111 (10th Cir. 1990) (citation omitted).

Here, Plaintiff was responsible for directing the activities of Sen. Williams' Delaware County office on his behalf, a position that by its nature carries a high level of personal accountability to the Senator.  Further, it is undisputed that, like in *Birch* and *Nichols*, Sen. Williams relied heavily on Plaintiff, as she was supposed to be his primary representation in Delaware County – not only his eyes and ears, but also the person his Delaware County constituents could turn to.  (SUMF at ¶ 19.)  In her role, she brought important and sensitive constituent issues directly to Sen. Williams' attention.  (*Id.*)  The role of Director of Constituent Services Delaware County was vital to making sure Sen. Williams was serving the needs of his constituents, and the position was intended to make sure he obtained a high-level of oversight over the issues of his Delaware County constituents.  (SUMF at ¶ 20.)  To this end, the role Plaintiff occupied was one that Sen. Williams needed to give a high degree of trust and responsibility to, so that she could represent him

11

in Delaware County.  (*Id.*)  Moreover, Plaintiff shared a deep and lengthy personal relationship with the Senator.  (SUMF at ¶ 4.)

To the extent that Plaintiff attempts to claim that she did not have an intimate working relationship with Sen. Williams because she worked in the Yeadon office, *Birch* stands to reason that "a relationship does not lose its intimate status merely because [a plaintiff] is afforded a necessary degree of autonomy in her work, such that she and [the elected official] need not interact on a daily basis.  *Birch*, 392 F.3d at 159.  Regardless, Plaintiff conceded that, despite not interacting daily with the Senator, she in fact worked at the main office on a "regular basis."  (SUMF at ¶ 22.)

For these reasons, the sixth factor weighs in favor of Plaintiff fitting within the personal staff exemption.  Accordingly, on balance, the relevant factors weigh *strongly* in favor of a finding that Plaintiff was a member of Sen. Williams' personal staff.  Thus, Plaintiff is exempt from coverage under the FMLA, and this Court should dismiss Count Two of the Amended Complaint.

## 2. <u>Plaintiff Cannot Establish a *Prima Facie* Case of FMLA Retaliation.</u>

Alternatively, even if Plaintiff were an eligible "employee" and covered under the FMLA – which she is not – Plaintiff cannot establish a *prima facie* case of FMLA retaliation.[6]  In order to prove FMLA retaliation, an employee must show that her employer intentionally discriminated against her for exercising an FMLA right.  *Atchison v. Sears*, 666 F. Supp. 2d 477, 490 (E.D. Pa. 2009).  Courts analyze claims of FMLA retaliation under the *McDonnel Douglas* burden-shifting framework.  *Wilson v. Graybar Elec. Co.*, 2019 U.S. Dist. LEXIS 42339, at *60 (E.D. Pa. Mar. 15, 2019) (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)).  Under this framework, Plaintiff must establish a *prima facie* case of FMLA-retaliation by showing

---

[6] Count Two of the Amended Complaint purports to bring a claim for FMLA retaliation, as opposed to FMLA interference.  Plaintiff's deposition testimony further clarifies that her FMLA claim sounds in retaliation and not interference: "Q. . . . but no one from Senator Williams' office including Senator Williams ever told you that you may not take a day off that you needed.  Correct?  A. They never told me that."  (SUMF at ¶ 112.)

that: (1) she invoked her right to FMLA-qualifying leave; (2) she suffered an adverse employment decision; and (3) the adverse action was causally related to her invocation of rights. *Lichtenstein*, 691 F.3d at 301-02.  If Plaintiff establishes a *prima facie* case, the burden of production shifts to Sen. Williams to "articulate some legitimate, nondiscriminatory reason" for his decision. *Lichtenstein*, 691 F.3d at 301-02.  Once Sen. Williams does so, the ultimate burden shifts back to Plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably disbelieve [Sen. Williams'] articulated legitimate reasons." *Lichtenstein*, 691 F.3d at 302 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)) (punctuation omitted).  To be clear, Plaintiff retains the ultimate burden "to prove that [Sen. Williams'] explanation is merely a pretext for the employment discrimination." *Wilson*, 2019 U.S. Dist. LEXIS 42339, at *31.

Importantly, with regard to her *prima facie* case, the simple fact that Plaintiff's employment terminated sometime during her intermittent Senate Family Medical Leave ("SFML") is not, in and of itself, enough to create an inference of retaliation. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) ("the mere fact that [an] adverse employment action occurs after [protected conduct] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events").  Rather, the Third Circuit has articulated two factors relevant to the causation analysis:  (1) a showing that the two events were close in time; or (2) evidence of ongoing antagonism toward the employee. *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006)).  In the absence of unusually suggestive temporal proximity or a pattern of antagonism, the Court may "consider all of the proffered evidence as a whole to determine whether it may suffice to raise the inference of causation." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

Significantly, with regard to the first factor, "courts have found that a plaintiff cannot establish a causal link when the 'decision' to take adverse employment action occurred **before** plaintiff exercised his or her FMLA rights." *Atchison*, 666 F. Supp. 2d at 490 (emphasis added); *see*

*also Burch v. WDAS AM/FM Inc.*, 2002 WL 1471703, *10 (E.D. Pa. June 28, 2002) ("In the instant case, however, the evidence that the decision to terminate plaintiff was made before he requested or took leave is uncontroverted.  One cannot reasonably conclude that plaintiff was terminated for something which occurred after the decision to terminate him was made.").  As demonstrated in Defendants' SUMF, in this case there is uncontroverted evidence that Sen. Williams made the decision to discharge Plaintiff well *before* he learned that Plaintiff requested or took SFML. (SUMF at ¶¶ 41, 99-102.)  Specifically, Sen. Williams made the decision to discharge Plaintiff in October 2018, and Plaintiff did not notify Sen. Williams or the Caucus or her need for SFML until November 13, 2018.  (SUMF at ¶¶ 99-102, 108.)  This fact alone is dispositive.

However, even in a situation where Sen. Williams did not make the decision to terminate Plaintiff's employment until after he learned she requested or took leave, Plaintiff still cannot use the first factor (timing) to meet her burden of showing causation.  The question of timing focuses on the "temporal proximity between the protected activity and the termination." *Capps v. Mondelez Global LLC*, 147 F. Supp. 3d 327, 336 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017) (quoting *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004)).  The Third Circuit has held that any alleged temporal proximity must be "unusually suggestive of retaliatory motive" before a causal link will be inferred.  *Williams*, 380 F.3d at 760.  Notably, the Third Circuit has found that temporal proximity should be measured from the first date on which the litigant engaged in protected activity.  *See Capps*, 147 F. Supp. 3d at 337 (citing *Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014)).

Here, there is nothing "unusually suggestive" about the temporal proximity between the date on which Sen. Williams first learned that Plaintiff may need to take SFML leave (November 13, 2018) and the date she was notified that her employment would be terminated (December 5, 2018). (SUMF at ¶¶ 32, 108.)  District Courts in the Third Circuit have found that, in order to be

14

considered "unusually suggestive," the temporal proximity between the participation in a protected activity and the adverse employment action must be measured in "days," not weeks or months.  *See Arnold v. AutoZone, Inc.*, No. 13-1329, 2016 U.S. Dist. LEXIS 25759, at *31-32 (E.D. Pa. Mar. 2, 2016) (finding that gap of 26 days was insufficient, and noting that "the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence."); *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 531 (E.D. Pa. 2014) ("Six days is at the long end of what has been held to be unusually suggestive."); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding that 3 weeks was not "unusually suggestive").  Here, Plaintiff was notified that her employment would be terminated weeks after she initiated her intermittent SFML leave, not mere days.  (SUMF at ¶¶ 32, 108.)  Thus, the timing is not unusually suggestive.

With regard to the second causation factor, Plaintiff has not offered any evidence of ongoing antagonism associated with her November 2018 intermittent SFML.  Although Plaintiff alleged in the Amended Complaint that "Senator Williams made comments reflecting his displeasure when Plaintiff was not at the legislative office" (Dkt. entry no. 18, Am. Compl. at ¶ 15), Plaintiff clarified at her deposition that it was not that Sen. Williams expressed displeasure about *Plaintiff's* absences from the office, but rather, with the fact that *all* of his offices were understaffed due to his staffers across *all* offices being absent.  (SUMF at ¶ 115.)  In fact, when asked whether anyone ever made a comment that her health condition was the cause of the issue of one of the offices being understaffed, Plaintiff said "I don't recall, no."  (SUMF at ¶ 116.)  Moreover, Plaintiff was unable to cite to any evidence or recall any specific instance where Sen. Williams – or any of his staff members – connected the vacancy of his offices to her medical condition, or referred to her as being responsible for any staffing issues or for the Yeadon Office being understaffed.  (SUMF at ¶ 117.)

15

Lastly, Marlene Henkin testified that they were able to get coverage for the Yeadon Office when Plaintiff needed to take leave.  (SUMF at ¶ 118.)

Nor has Plaintiff proffered any other evidence that could substantiate a finding that Sen. Williams discharged her because of her SFML.  Importantly, it is undisputed that Plaintiff took two SFMLs approximately two years before her employment ended, from each she returned to work without issue.  (SUMF at ¶¶ 104-07.)  Plaintiff also took days off throughout 2017 for various medical appointments without issue.  (SUMF at ¶ 107.)  Plaintiff even received a raise while she was on SFML in 2017.  (SUMF at ¶ 105.)  Plaintiff admits she has no complaints with how Sen. Williams handled her earlier SFML, or any time off she took before her November 2018 leave of absence.  (SUMF at ¶¶ 107, 111-12.)  In fact, the record evidence demonstrates that Sen. Williams was supportive and understanding with regard to Plaintiff's health issues and need for time off, and Plaintiff testified that no one from Sen. Williams' office, including Sen. Williams, ever told her that she may not take a day off that she needed.  (SUMF at ¶¶ 112-13.)  This alone counsels against a finding of a causal connection between her November 2018 SFML and her termination.  *See Calero v. Cardone Indus.*, 2012 U.S. Dist. LEXIS 91173, at *24-25 (E.D. Pa. June 29, 2012) (finding that history of FMLA use without issue bolsters defendant's assertion that plaintiff's termination had nothing to do with his FMLA leave).

On these facts, there is, quite simply, no basis upon which it can be inferred that Sen. Williams retaliated against Plaintiff when he terminated her employment.  Plaintiff's *prima facie* case of FMLA retaliation fails for this reason.

### 3.     Plaintiff Has No Evidence that Her Termination was a Pretext for FMLA Retaliation.

Even assuming *arguendo* that Plaintiff can establish a *prima facie* case of FMLA retaliation, which she cannot, Sen. Williams, nonetheless, would be entitled to summary judgment on Count

Two of the Amended Complaint because Plaintiff has no evidence that his legitimate, non-discriminatory reasons for terminating her employment were a pretext for FMLA retaliation.

To establish pretext, Plaintiff must point to some direct or circumstantial evidence from which a factfinder could reasonably either (1) disbelieve Sen. Williams' articulated reason for terminating her employment, or (2) believe that an invidious discriminatory reason was more likely than not the real cause of Sen. Williams' decision.  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  In order to satisfy the first pretext prong, Plaintiff must either discredit Sen. Williams' reasons by coming forward with such weaknesses, implausibilities, incoherencies, inconsistencies, or contradictions in Sen. Williams' proffered reasons to allow a rational factfinder to find the reasons unworthy of credence.  *Lichtenstein*, 691 F.3d at 309.  In order to satisfy the second pretext prong, Plaintiff must adduce evidence that FMLA-retaliation was more likely than not the real cause of her termination.  *Id*.  At a minimum, Plaintiff must show evidence of prior discrimination against her or others in her protected class, or evidence of more favorable, disparate treatment of those "similarly situated" who are not in the plaintiff's protected class.  *Hoy v. Borough of Cochranton*, 2016 WL 7406807 at *7 (Pa. Super. Jan. 6, 2017) (citing *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 645 (3d Cir. 2015)).

Plaintiff's evidence must allow a reasonable factfinder to infer that Sen. Williams' legitimate, non-discriminatory reason for terminating her employment was either a *post hoc* fabrication or, otherwise, did not actually motivate his decision.  As the Third Circuit has observed, proving pretext "places a difficult burden on the plaintiff."  *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d at 765).  Nor is pretext created in a vacuum.  As the Supreme Court has explained, "[i]t is not enough . . . to disbelieve the employer; the fact-finder must believe the plaintiff's explanation of intentional discrimination."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993).

17

As more fully set forth in the SUMF, Sen. Williams articulated legitimate, non-discriminatory reasons for his employment action – namely that Plaintiff's employment was terminated as a part of the Reorganization and Transition Plan, based both of the fact that her position was eliminated and because of her representation of the Senator in Delaware County fell short.  (SUMF at ¶¶ 25-27, 33-35.)[7]  Plaintiff has no basis upon which to claim that this legitimate, non-discriminatory reason was implausible or a *post hoc* fabrication.

Rather, Plaintiff readily admits that a reorganization occurred.  (SUMF at ¶ 29.)  The fact that Plaintiff's layoff was part of the office reorganization makes Plaintiff's already difficult burden of proving pretext even more challenging.  This is because similarly situated employees who were not on SFML were adversely impacted by the reorganization as well.  Indeed, Desaree Jones, Don Cave, Plaintiff, and others were all affected by the reorganization in some manner, with Don Cave having been notified of his termination in tandem with Plaintiff on the exact same day, and Plaintiff was the only one who had taken medical leave.  (SUMF at ¶¶ 31-32, 129; Eicher Decl. at ¶ 8.)  Conversely, there were two employees – Brenda Tate and Kevin Fassett – who had taken medical leaves of absence around the same time as Plaintiff, and they were retained during the reorganization.  (SUMF at ¶ 96, 114, 127-28.)  Indeed, not only did Sen. Williams retain Fassett, but on July 5, 2018 – just over a month after he returned to work following a medical leave of absence, Sen. Williams promoted Fassett and provided him with a pay raise.  (SUMF at ¶ 97, 128.)  That Sen. Williams not only was supportive of Plaintiff's health issues and need for time off throughout her employment, has an extensive track record of being supportive of medical leaves of absence taken by other staff members, has not otherwise been accused of violating a staffer's

---

[7] The employer's burden in articulating (not proving) a legitimate, nondiscriminatory or non-retaliatory reason is "relatively light." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006).  The fact-finder makes no credibility or truth assessment.  Rather, the fact-finder accepts the employer's evidence at face value and does no more than determine whether it presents a nondiscriminatory legitimate reason, regardless of whether ultimately persuasive or not. *See St. Mary's Honor Ctr.*, 509 U.S. at 509.

medical leave rights, and himself underwent treatment and recovery for cancer, further validates that some invidious discriminatory reason was not the real cause of Sen. Williams' decision. (SUMF at ¶¶ 107, 112-14, 125-28.)

While Plaintiff can be expected to contend that Sen. Williams was unhappy with her need to take a medical leave, there is no record evidence to support this subjective belief.  Revealingly, Plaintiff testified that her evidence showing Sen. Williams made a decision to fire her because of her medical leave was a "tone" in his voice during a brief telephone call they shared in November 2018.  (SUMF at ¶ 109.)  Specifically, Plaintiff testified that she called the Senator while she was in the hospital and told him that she needed more testing, and that his response was "is this because of the same reason" (referring to her earlier cancer diagnosis).  (SUMF at ¶ 108.)  Plaintiff testified that she told him that it was and that she could not talk any further at the moment, to which Sen. Williams responded: "Well, call me later on when you get settled."  (SUMF at ¶ 108.)  Plaintiff further testified that his tone did not sound like he was concerned, rather, it sounded like he was annoyed.  (SUMF at ¶ 109.)  Plaintiff testified:

> Q.    Do you recall anything else he said during the call?
> A.    No.  But his tone, the way he asked me was it related to the same thing was as though he was annoyed.
> Q.    That leads you to believe that the senator made a decision to fire you because of your health condition?
> A.    Yes. . . .  If he was concerned, it didn't sound concerning.

(SUMF at ¶ 109.)[8]  To the extent Plaintiff attempts to argue that Sen. Williams' "tone" during their brief telephone call is evidence proves pretext, district courts in this Circuit have held that a supervisor's tone during a telephone conversation is not probative of pretext"  *See, e.g.*, *Robinson v. Nat'l Med. Care, Inc.*, 897 F. Supp. 184, 188 (E.D. Pa. 1995) ("[A]ccording to plaintiff's evidence,

---

[8] As a threshold matter, Plaintiff's comment that this made her believe that Sen. Williams discharged her because of her health condition is not relevant, as it does not relate to any need for medical leave and there is no disability claim against Sen. Williams in this lawsuit.

a supervisor was abrupt and spoke with an accusatory tone during a telephone conversation after she had called to take a sick day.  Incidents of this type, unless systematic and reflective of disparate treatment, are not probative of pretext.") (citations omitted).  Any such argument by Plaintiff similarly fails as a matter of law.

In the end, Plaintiff will be unable to offer anything more than her unsupported, conclusory, and subjective belief that Sen. Williams terminated her employment because she exercised her right to SFML, and it is well-established that a plaintiff's subjective belief does not suffice to establish pretext for purposes of a motion for summary judgment.  *See, e.g.*, *Ekhato v. Rite Aid Corp.*, 529 F. App'x 152, 156 (3d Cir. 2013) ("Ekhato's subjective belief that the decision to terminate her employment was discriminatory is insufficient."); *James v. Sutliff Saturn, Inc.*, 468 F. App'x 118, 121 (3d Cir. 2012) ("[Plaintiff's] unsupported belief that he was fired for discriminatory reasons falls far short of establishing pretext.").

Consequently, because Plaintiff cannot establish that Sen. Williams' stated basis for terminating her employment was a pretext for FMLA retaliation, Sen. Williams is entitled to summary judgment on Count Two of the Amended Complaint.

**C.**   **Sen. Williams Is Entitled to Summary Judgment on Plaintiff's Aiding and Abetting Age Discrimination Claim.**

**1.**   **As a Matter of Law, Plaintiff's Aiding and Abetting Claim against Sen. Williams Must Be Dismissed Because There Is No Corresponding Primary Violation By an Employer to Aid and Abet.**

As a matter of law, the only way for Plaintiff to establish that Sen. Williams aided and abetted age discrimination is to show that Plaintiff's employer – the Caucus – engaged in an underlying act of age discrimination against her.  *See, e.g.*, *McIlmail v. Pennsylvania*, 381 F. Supp. 3d 393, 415 (E.D. Pa. 2019).  This is an inescapable reality of aiding and abetting claims brought under the PHRA.  Plaintiff, however, failed to plead (and indeed has not alleged sufficient facts to

show) a primary violation by her employer, and, thus, her aiding and abetting claim against Sen. Williams must fail.

"The employment discrimination provision of the PHRA declares only that 'any employer' may be held liable." *Dici v. Cmwlth. Of Pa.*, 91 F.3d 542, 552 (3d Cir. 1996) (citing 42 Pa. Stat. § 955(a)).  Unlike the FMLA, individuals are not included in the PHRA's definition of an employer. Section 955(e) can extend liability to supervisory employees who aid and abet the alleged discrimination under specific circumstances. *McIlmail*, 381 F. Supp. 3d at 415.  Logically, it is dispositive here that, "[e]ven if an individual employee is a supervisor for purposes of aiding and abetting liability under the PHRA, the Plaintiff must show a "primary violation" by the employer. **Individual defendants cannot . . . be liable for violations of § 955(e) if there is no primary violation of the PHRA**." *McIlmail*, 381 F. Supp. 3d at 415 (emphasis added); *Lombard v. Lassip, Inc.*, 2017 WL 6367956, *5 (E.D. Pa. Dec. 13, 2017) ("'For liability to be imposed on an aiding and abetting theory, however, there must be a cognizable predicate offense,' *i.e.*, a violation by the employer of the PHRA's primary anti-discrimination provision."); *Dickinson v. Millersville Univ. of Pa.*, 2014 WL 1327610, *5 (E.D. Pa. Apr. 3, 2014) (same).

This requirement is not in dispute and entitles Sen. Williams to summary judgment.  The Amended Complaint contains no PHRA claim against Defendant Caucus.  *See, e.g.*, *Dickinson*, 2014 WL 1327610, *5 (granting summary judgment "because there is no statutory offense against [the employer] that [the individual defendants] are alleged to have aided and abetted"); *Scott v. Sunoco Logistics Partners, LP*, 918 F. Supp. 2d 344, 357, n.5 (E.D. Pa. 2013) (granting summary judgment and holding that "[i]f the employer is not liable for any discriminatory practice than an individual employee cannot be held liable for aiding and abetting a discriminatory practice"); *Kaniuka v. Good Shepherd Home*, 2006 WL 2380387, *10 (E.D. Pa. Aug. 15, 2006) (granting summary judgment and stating that it was unnecessary to determine whether individual defendant

21

was supervisory employee for purposes of PHRA because "[i]ndividual defendants cannot violate PHRA section 955(e) when there is no corresponding section 955(a) violation by an employer to aid and abet"). Courts have also dismissed aiding and abetting claims where, like here, a claim against the employer is not actionable. *See, e.g.*, *Lombard*, 2017 WL 6367956, at *5 (holding that because plaintiff's PHRA claims against employer were time-barred, there was no violation of PHRA's primary anti-discrimination provision, and, thus, aiding and abetting claim against individual defendant was futile); *Burgess-Walls v. Brown*, 2011 WL 3702458, *6 (E.D. Pa. Aug. 22, 2011) (finding that, because PHRA claim was time-barred, plaintiff did not "plausibly state[] a PHRA claim of discrimination against the City," and, thus, aiding and abetting claim against supervisor "necessarily fails as well."[9]

Here, Amended Count Three alleges Sen. Williams "aided and abetted the unlawful decision to discharge from her employment [sic] on account of her age." (Am. Count Three at ¶ 46.) Because Plaintiff does not plead a PHRA § 955(a) claim against the Caucus (and could not maintain one even if she did), summary judgment should be entered in favor of Sen. Williams.[10]

---

[9] Here, Plaintiff could not plausibly state a PHRA claim against her employer because the Caucus is immune from a PHRA claim in federal court under the Eleventh Amendment of the United States Constitution. *See, e.g.*, *Nelson v. Com. of Pa. Dept. of Public Welfare*, 244 F. Supp. 2d 382, 391 (E.D. Pa. 2002) (stating that Eleventh Amendment bars state law claims against the States, state agencies, and their agents in federal courts). Plaintiff's inability to state a PHRA claim against the Caucus is analogous to the plaintiffs' inabilities in *Lombard* and *Burgess-Walls* to sustain PHRA claims against the employers because such claims were time-barred. *Lombard*, 2017 WL 6367956, at *5; *Burgess-Walls v. Brown*, 2011 WL 3702458, at *6.

[10] Plaintiff's aiding and abetting claim also fails as a matter of law because Sen. Williams is entitled to immunity. *See Nelson*, 244 F. Supp. 2d at 391 ("The Commonwealth has also explicitly stated that those state employees acting within the scope of their duties, are protected by sovereign immunity."); *see also Cory v. White*, 457 U.S. 85, 91 (1982) (stating that Eleventh Amendment immunity also extends to suits for monetary relief against state officials sued in their official capacity). Here, despite the fact that the Amended Complaint's caption gratuitously labels Sen. Williams as a Defendant "in his individual capacity," the nature of the allegations demonstrate that Plaintiff has actually sued Sen. Williams in his *official* capacity (*i.e.*, he terminated Plaintiff's employment in his role as her supervisor). Because the allegations describe Senator Williams acting in his official capacity, and because suits against individual defendants in their official capacities are the same as a suits against States and their agencies, Plaintiff's PHRA claim is barred by the Eleventh Amendment.

2.    **Plaintiff's Aiding and Abetting Claim Must Be Dismissed because Plaintiff Cannot Establish an Unlawful Discriminatory Practice under the PHRA.**

a.    **Plaintiff cannot show a *prima facie* case of age discrimination.**

Assuming *arguendo* that Plaintiff properly asserted a primary claim of age discrimination against her employer – and assuming that claim was legally plausible – such a claim would fail because Plaintiff cannot establish a *prima facie* case of age discrimination.[11]  The *McDonnell Douglas* burden-shifting framework requires that Plaintiff first establish a *prima facie* case of age discrimination.  *Scott v. Airtran Airways, Inc.*, 2006 WL 2711654, *3 (W.D. Pa. Sept. 21, 2006). To establish a *prima facie* case, Plaintiff must be able to show that she (1) was a member of the protected class, *i.e.*, was over 40 years old, (2) was qualified for the position, (3) suffered an adverse employment decision, and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination.  *Arnold v. Autozone*, 2016 WL 807805, *7 (E.D. Pa. 2016).[12]

---

[11] Although not relevant to Plaintiff's aiding and abetting claim because there is no primary violation even asserted against her employer, the analysis below will also prove that Plaintiff nonetheless is unable to establish that Sen. Williams himself discriminated against her on the basis of her age.

[12] Plaintiff has alleged in this matter that she was discharged and replaced with someone "approximately one-half [her] age."  (Am. Compl. at ¶ 22; *see also* Exhibit A, Pl.'s Dep. at 29:21 – 30:24 ("Q. . . . You said that you were told that your job was being eliminated.  Is that right?  A. Correct.  Q. Okay.  Do you believe that reason?  A. Do I believe it? No, I don't believe it.  Q. Why not?  A. Because there is a person half my age that was put in that role.  The title was slightly changed, but functioning in that role.").)  For this reason, Defendant has analyzed Plaintiff's age discrimination claim using the *prima facie* standard applicable to discharge cases.  *See Arnold*, 2016 WL 807805, at *7.  However, even though Plaintiff was discharged, in part, due to her performance, should this Court analyze Plaintiff's age discrimination claim using the *prima facie* standard applicable to reductions in force – because the other reason she was discharged is that her position was eliminated – Plaintiff would still not be able to establish a *prima facie* case.

"Where a plaintiff's discrimination claim is premised upon a reduction in force, the plaintiff must instead establish that he was a member of the protected class when he was laid off, that he was qualified for his position and that other similarly situated, but substantially younger employees were retained."  *Read v. Stone and Webster Eng. Corp.*, 6 F. Supp. 2d 398, 402 (E.D. Pa. 1998).  In *Read*, the plaintiff's *prima facie* case failed on the fourth element, as the Court found that "[a]lthough . . . Defendant employed a number of employees who were significantly younger than the plaintiffs at the time plaintiffs were laid off, these same records reflect that defendant also employed other employees who were in the same general age group as plaintiffs."  *Id.* at 402-03.  The Court recognized that no evidence was produced to support the plaintiffs' claims that they were replaced by significantly younger employees or to delineate which employees were retained over others.  *Id.* at 403.  In *Klinman v. JDS Uniphase Corp.*, the plaintiff (age 58) alleged that two employees were retained over her, one who she alleged was "age 34" and one (Ms. Glover) who she alleged was "in her thirties."  *Klinman v. JDS Uniphase Corp.*, 439 F. Supp. 2d 401, 406-07 (E.D. Pa. 2006).  The Court held that the "supposition that Ms. Glover was 'in her thirties' at the time [the plaintiff's] employment was terminated is insufficient to establish that Ms. Glover was sufficiently younger than [the plaintiff]."  *Id.* at 407 (finding, however, that age differential between plaintiff and other employee (34 years old) nonetheless satisfied fourth prong).

23

Plaintiff's *prima facie* case fails because she cannot satisfy the fourth element.  Plaintiff baldly asserts that she was replaced by Rudy Taylor, an individual she speculates is "approximately one-half [her] age."  (Am. Compl. at ¶ 22.)  As an initial matter, there is no record evidence concerning Mr. Taylor's age in this case.  The absence of such information alone necessitates the dismissal of Plaintiff's age discrimination claim.  *See Taylor v. West Penn Allegheny Gen. Hosp.*, 2005 WL 3113187, *2 (W.D. Pa. Nov. 21, 2005) (granting summary judgment on plaintiff's age claim because "Plaintiff has failed to meet the fourth prong of her *prima facie* case" as "there is no evidence regarding . . . her replacement's age").  Although simple, this lack of critical evidence alone is dispositive.

Moreover, when asked at her deposition what evidence she has demonstrating that Rudy Taylor replaced her, she responded "A, his business card; B, attending community meetings with him in his new capacity that would have been me sitting in that capacity."  (*See* Exhibit A, Pl.'s Dep. at 145:5-17.)  Although unclear, Defendant assumes Plaintiff is inferring that because Taylor's card displayed a title – Director of Community Outreach for Delaware County – that was similar to hers, he necessarily replaced her.  However, not only was Taylor's title different from Plaintiff's (Plaintiff's title was "Director of Constituent Services Delaware County"), but his title was changed before Plaintiff was discharged.  (SUMF at ¶¶ 32, 40, 44.)  In particular, Sen. Williams recognized a lack of sufficient community outreach by his staffers, and focused part of the reorganization on

---

Here, should this Court employ *prima facie* standard applicable to reductions in force, Plaintiff's case would similarly fail at the fourth prong.  First, like in *Klinman*, Plaintiff's supposition that Rudy Taylor is "approximately one-half [her] age" is insufficient to establish that he was sufficiently younger than her.  *Id.*  (Am. Compl. at ¶ 22; *see also* Exhibit A, Pl.'s Dep. at 29:21 – 30:24.)  Plaintiff has pointed to no other individuals whom she claims were retained over her. Second, as demonstrated at length in the SUMF, and below, in connection with the reorganization and transition plan, Sen. Williams discharged staffers that were far younger than Plaintiff (Don Cave at 38, and Desaree Jones at 41), retained and promoted staffers that were older than Plaintiff (*e.g.*, Kevin Fassett at 60, Ethel Waters at 62), and hired staffers that were approximately Plaintiff's age (Joy Norman at 58, Mannwell Glenn at 57, and Lynne Wilkins at 58). (SUMF at ¶¶ 31, 36, 42-43 128.)  For these reasons, Plaintiff is unable to establish the fourth prong under the reduction in force standard.  Moreover, assuming *arguendo* that Plaintiff made out a *prima facie* case under the reduction in force standard, her claim would nonetheless fail at the pretext stage for the reasons discussed *infra*.

creating new county-specific community outreach roles.  (SUMF at ¶¶ 26, 44.)  To this end, Taylor was promoted to "Director of Community Outreach for Delaware County," Rob Murray was promoted to "Director of Community Outreach for South Philadelphia," and Ethel Waters was eventually promoted to "Community Outreach Manager."  (SUMF at ¶¶ 43-44.)  The Yeadon Office in particular suffered from a lack of effective community outreach.  (SUMF at ¶ 26.)

Next, with regard to Plaintiff's contention that she saw Taylor at community meetings that she would have attended had she still been employed, Defendant assumes that Plaintiff is attempting to claim that Taylor absorbed her duties, and thus replaced her.  However, the record evidence does not support this.  Rather, Plaintiff's various responsibilities were very briefly distributed among several staffers until they were consolidated among other duties into a new role filled by a new employee, Joy Norman.  (SUMF at ¶¶ 50-59.)

To examine whether Plaintiff was replaced by Mr. Taylor, as she claims, it is necessary to analyze her job duties and who assumed them when she left.  Plaintiff was responsible for the daily operations of the Senator's Yeadon Office, operating as a community liaison for Sen. Williams, representing Sen. Williams at community meetings, vetting meetings for the Senator, planning events throughout Delaware County, and handling constituent services work.  (SUMF at ¶¶ 17, 54.)  With regard to the constituent services component of her job, Plaintiff was responsible for constituent services in the Delaware County boroughs of Yeadon, Sharon Hill, Collingdale, Lansdowne, and Folcroft.  (SUMF at ¶ 54.)  Months before Plaintiff's separation, Rudy Taylor was transferred to the Yeadon Office to help strengthen the deficient community outreach efforts of that office.  (SUMF at ¶¶ 15, 45.)  While there, and before Plaintiff left, he was responsible for constituent services in the Delaware County boroughs of Darby, Darby Township, Colwyn, and Norwood.  (SUMF at ¶ 56.)  After Plaintiff's separation, Mr. Taylor very briefly assumed responsibility for the constituent services work in a few, but not all, of the boroughs Plaintiff

25

previously covered (Yeadon, Sharon Hill, and Collingdale), until the office reorganization was complete and a new employee could assume responsibility for those boroughs. (*Id.*) Notably, he did not assume responsibility over many of Plaintiff's other job duties, not the least of which included being in charge of the daily operations of the Yeadon Office. (*Id.*) Rather, Marlene Henkin voluntarily transferred to the Yeadon Office and, *inter alia*, assumed responsibility over many of the daily operations of the office, as well as took on some of Plaintiff's responsibilities related to constituent service work, until her retirement. (SUMF at ¶¶ 50, 55, 57.)

Moreover, any responsibility Taylor had for the constituent services in the Yeadon, Sharon Hill, and Collingdale boroughs was fleeting, and intended only as a gap-filler until a permanent solution was found during the reorganization. (SUMF at ¶¶ 52-54, 57-59.) That permanent solution was Joy Norman (age 58 at the time of her hire) who, in her role as Office Manager of the Delaware County office, took over, and to this day maintains, responsibility for all of Plaintiff's boroughs, including Yeadon, Sharon Hill, Collingdale, Lansdowne, and Folcroft. (SUMF at ¶¶ 42, 52, 57-59.)[13] Indeed, as Mr. Taylor testified explicitly, he does not have primary responsibility over *any* of the boroughs that he temporarily covered for Plaintiff. (SUMF at ¶ 59.) For the interim period, however, Mr. Taylor was the logical choice to cover the portion of Plaintiff's duties involving community outreach in Delaware County, as he lives in Darby Borough and is well-connected in Delaware County. (SUMF at ¶ 46.) Accordingly, because Mr. Taylor did not absorb all of Plaintiff's duties, and because those duties that he did help out with on a short term basis were ultimately absorbed by someone similar in age to Plaintiff, Plaintiff cannot satisfy prong four of her *prima facie* case.[14]

---

[13] To be clear, Joy Norman did not technically replace (or "backfill") Plaintiff position. Instead Sen. Williams consolidated portions of duties from several roles (including many of Plaintiff's duties) into the position he hired Joy Norman into. (SUMF at ¶¶ 30, 35, 51-52, 57-58.)

[14] It is also notable that the decision-maker in this matter – Sen. Williams – is **older than Plaintiff**. (SUMF at ¶ 9.) While not dispositive, courts regularly find this fact significant, and strong support for the contention that the defendant

> **b.     Plaintiff has no evidence that her inclusion in the reorganization
> was a pretext for age discrimination.**

Assuming *arguendo* that Plaintiff is able to make out a *prima facie* case of age

discrimination – and more specifically a primary violation by the Caucus that Sen. Williams could

aid and abet – Plaintiff's Amended Count Three still fails as a matter of law because Plaintiff is

unable to prove pretext.  Sen. Williams' legitimate, non-discriminatory reasons for terminating

Plaintiff's employment, explained at length in the SUMF (*see* SUMF at ¶¶ 24-29, 32-35), and

summarized *supra*, need not be repeated.  As Sen. Williams clearly satisfied his minimal "burden"

of articulating legitimate, non-discriminatory reasons for the termination, the burden reverts to

Plaintiff to show that those articulated reasons are a pretext for age discrimination.

Plaintiff cannot satisfy either pretext prong – that is, the record is devoid of any evidence (1)

that would allow for Sen. Williams' reasons for the discharge to be disbelieved, and (2) to believe

that an invidious discriminatory reason was more likely than not the real cause of the decision (such

as, evidence of prior age discrimination against Plaintiff or others in her protected class, or evidence

of disparate treatment).  *Fuentes*, 32 F.3d at 764.[15]

As to the first prong, Plaintiff has no basis upon which to claim that her inclusion in the

Reorganization and Transition Plan was implausible or a *post hoc* fabrication.  Plaintiff simply asks

this Court to find that, although she readily admits that a reorganization occurred, only those

employees who were significantly younger than her were actually part of the reorganization, while

she and the other employees approximately her age were victims of age discrimination.  (SUMF at

¶ 120.)  However, Plaintiff admitted that she has no evidence to support this farfetched theory of

---

did not discrimination against the plaintiff on the basis of age.  *See, e.g.*, *Hicks v. Tech Indus.*, 512 F. Supp. 2d 338, 349 n.9 (W.D. Pa. 2007) (citing *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998); *Ziegler v. Delaware Co. Daily Times*, 128 F. Supp. 2d 790, 811 n.47.  Plaintiff admitted knowing that Sen. Williams is older than her.  (SUMF at ¶ 10.)

[15] Plaintiff's burden to demonstrate pretext under the *McDonnell Douglas* framework is covered in full in Section III(B)(3), *supra*.

convenience, testifying at her deposition that she was "speculating" that she and Marlene Henkin were subjected to age discrimination merely because of who was put into their positions, while conceding that Desaree Jones and Don Cave were terminated as a part of the reorganization. (SUMF at ¶¶ 120-22.)[16]  When asked whether she believes that her employment ended due to the reorganization, Plaintiff testified that she did not "[b]ecause there is a person half my age that was put in that role.  The title was slightly changed, but functioning in that role, in that capacity." (Exhibit A, Pl.'s Dep. at 29:19 – 30:7.)  However, as explained in detail above, Rudy Taylor was not "put in" Plaintiff's role, and at no point assumed all of Plaintiff's duties.  (SUMF at ¶¶ 44, 52-59.)  At the summary judgement stage, Plaintiff can no longer rely on assumptions, but must have record evidence to support her claims, and she does not.

Nor does the record contain evidence for the second pretext prong.  Plaintiff does not have evidence of prior age discrimination against herself or others in her protected class, or evidence of disparate treatment.  Specifically, Plaintiff does not allege that she suffered age discrimination prior to her discharge, and she is unable to point to any particular instance where Sen. Williams made any specific ageist comment.  (SUMF at ¶ 122.)  Although she speculates that Marlene Henkin "was let go because of her age" (Ex. A, Pl.'s Dep at 52:8-9), Plaintiff admitted that this was mere "speculat[ion]" on her part, and the reality is that Henkin voluntarily retired and never suggested that she thought she was being discriminated against because of her age.  (SUMF at ¶¶ 24, 60, 120-21, 124.)  Plaintiff also certainly has no evidence of disparate treatment.  That Sen. Williams elected to terminate Plaintiff (59 years old) and Don Cave (38) on the same day, while promoting and giving a raise to the only other long-term Yeadon Office staffer, Kevin Fassett (60 at the time of his promotion), proves the absence of disparate treatment.  (SUMF at ¶¶ 32, 36, 38, 97-98.)  Moreover,

---

[16] Plaintiff's full quote from her deposition and the surrounding context is contained in the SUMF at ¶ 121.  Although not pasted here due to page limitations, this passage demonstrates why Plaintiff's theory is meritless.

LEGAL\51142918\3

when the reorganization is viewed in its entirety across all offices, the lack of evidence demonstrating disparate treatment is even more apparent.  Three staffers were separated as part of the reorganization; their ages were 59 (Plaintiff), 38 (Don Cave), and 41 (Desaree Jones).  (SUMF at ¶¶ 31, 36, 38.)  Among those staffers retained during the reorganization were staffers whose ages at the time were 60 (Kevin Fassett – who received a promotion and raise), 53 (Brenda Tate), and 63 (Ethel Waters – who was promoted twice).  (SUMF at ¶¶ 43, 96-97, 127.)  The staffers whom Sen. Williams hired during the reorganization were individuals with the following ages at the time of their hire: 58 (Joy Norman), 57 (Mannwell Glenn), and 58 (Lynn Wilkins).  (SUMF at ¶ 42.)  These facts undermine any attempt to assert more favorable treatment of younger employees.

Based on Plaintiff's Amended Count Three, she can be expected to contend that Adam Nagel's May 18, 2018 and June 1, 2018 emails to Dawn Chavous demonstrate that age discrimination was the real cause of Sen. Williams' decision to terminate her employment.  (*See* Am. Count Three at ¶¶ 37-45.)  However, there is not a scintilla of evidence in this case that confirms that Sen. Williams adopted the opinions in the emails or made his employment decisions based on the ideas conveyed in the emails.  Rather, the record evidence demonstrates that Adam Nagel conceptualized and sent the emails in his capacity as an employee of Chavous Consulting (and not as a staffer for Sen. Williams),[17] sent the emails from his "adam@chavousconsulting" email address (and not from his Caucus email address), sent them only to Dawn Chavous (and not to Sen. Williams), and that Sen. Williams neither considered the opinions Nagel conveyed to Chavous therein, nor agreed with Nagel's vision for his office.  (SUMF at ¶¶ 64-65, 67-97.)  This is clear from the fact that in his emails to Dawn Chavous, Nagel opined that the Senator should discharge Kevin Fassett, Don Cave, Rudy Taylor, Brenda Tate, Marlene Henkin, Desaree Jones,

---

[17] Defendant again notes the misleading nature of the allegations in Amended Count Three, as Adam Nagel was not the Chief of Staff when he drafted the emails.  (SUMF at ¶¶ 49, 69.)

29

and Plaintiff, yet Sen. Williams only discharged Plaintiff, Jones, and Cave while retaining the others.  (SUMF at ¶¶ 74, 93, 96-97.)  Further, Sen. Williams explained how Nagel's vision differed from his own, and he provided uncontroverted testimony concerning the real reasons employees were selected for inclusion in the reorganization layoffs as opposed to those contained in Nagel's emails.  (SUMF at ¶¶ 86-97.)

There is simply a paucity of evidence upon which a reasonable fact finder could rely to reach the conclusion that a third-party consultant's internal emails and vision for the office should be imputed to Sen. Williams (or more importantly, to Plaintiff's employer, the Caucus).  Absent such evidence, Plaintiff fails to satisfy the second pretext prong, and, thus fails to demonstrate that a primary violation of the PHRA occurred that Sen. Williams aided and abetted.[18]  Therefore, this Court should grant Sen. Williams summary judgment with respect to Amended Count Three.

## IV.   CONCLUSION

For the foregoing reasons, Defendant Anthony H. Williams respectfully requests that this Court grant his Motion for Summary Judgment.

Respectfully submitted,

Dated: September 2, 2021

*/s/ Steven D. Millman*
Elizabeth A. Malloy, Esquire
Steven D. Millman, Esquire
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA   19103
(215) 446-0031
*Attorneys for Defendant*

---

[18] Even if Plaintiff had alleged, and could show, a primary violation of the PHRA on behalf of the Caucus, she would then have demonstrate that Sen. Williams aided and abetted that primary violation.  Under the PHRA, it is unlawful for "any person, employer, employment agency or labor organization or employee to aid, abet, incite, compel or coerce" discriminatory practices.  43 P.S. § 955(a).  "[T]he tort of aiding and abetting involves three elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."  *Dawkins v. Aramark*, 2010 WL 668543, *4 (W.D. Pa. Feb. 24, 2010).  For all of the reasons identified above, Plaintiff would fail to meet this burden as well.